Filed 12/22/25  In re N.K. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.K. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.W.,<br><br>Defendant and Appellant. | F089522<br><br>(Super. Ct. Nos. JD146584-00, JD146585-00)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Leila H. Moncharsh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Alexandria M. Ottoman, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Detjen, J. and Guerra, J.[†]

[†]     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Appellant Danielle W. (mother) is the mother of 12-year-old N.K. and 10-year-old A.W. (the children), who are the subjects of this dependency case. Mother challenges the juvenile court's orders issued at a jurisdiction and disposition hearing where the children were ordered to remain in mother's custody under a plan of family maintenance. Mother contends the court's jurisdictional findings are not supported by substantial evidence. We affirm.

## FACTS

### Siblings' Dependency Proceedings

In March 2024, the Kern County Department of Human Services (department) received a referral alleging severe neglect and physical abuse of the children's sibling, B.S., by mother and B.S.'s father, Brandon S. (stepfather). B.S. was transported to a children's hospital where it was determined she had a bilateral subdural hematoma and retinal hemorrhaging in both eyes. Further examination revealed bleeding in the brain and an injury to the cervical spine. The test results confirmed B.S. had suffered "abusive head trauma," and her injuries were consistent with "shaken baby syndrome."

Mother and stepfather were the sole care providers for B.S., and they did not have a reasonable explanation as to how the injuries occurred. The referral was substantiated for severe neglect and physical abuse against mother and stepfather. The children were seen by the department, and they remained in the care of mother. A dependency petition was filed on behalf B.S., and she was detained from mother and stepfather's custody on March 20, 2024. A contested jurisdiction and disposition hearing was set for B.S. on November 14, 2024.

In October 2024, mother gave birth to a baby girl, who was taken into protective custody due to the risk of physical abuse. A petition was filed on behalf of the newborn sibling, and a jurisdiction and disposition hearing was set for the newborn sibling on January 8, 2024.

2.

*Initial Removal*

On November 22, 2024, the department received a referral alleging stepfather disciplined the children in an aggressive manner. It was reported mother left the children in stepfather's care without supervision and she did not intervene when stepfather became aggressive with the children. Mother was reportedly isolating the children from friends and family to prevent them from discussing what happened in their home.

On December 2, 2024, an investigating social worker from the department called the reporting party for further information. The reporting party indicated there were many times the children went to bed without dinner. The children had informed the reporting party that it was a form of punishment, and they were not allowed to eat after 6:00 p.m. The reporting party stated stepfather used to physically discipline the children, but he had not done so since the siblings' dependency proceedings began. The children told the reporting party that they hated going home with mother and stepfather. Stepfather was identified as the children's primary care provider.

The social worker met with each of the children at their school. A.W. described his home life as " 'kind of good.' " He explained that stepfather yelled at him on a daily basis for getting in trouble. A.W. would be forced to write "two paragraphs of standards" when he got in trouble. He denied receiving physical discipline or going to bed without dinner. A.W. reported that he and his brother were both afraid of stepfather because of the yelling. Mother would not intervene when stepfather was yelling.

A.W. became teary eyed and begged the social worker not to tell stepfather about the conversation. He was worried that stepfather would get mad at him for reporting his concerns to the social worker. The social worker asked A.W. about domestic violence, and he reported verbal arguments often took place between mother and stepfather. However, he denied witnessing any physical fights between them. A.W. explained that mother would cry when father was yelling at her, and he was scared for his mother because he thought she was being hurt by stepfather. He was able to hear his mother

3.

saying "ouch" during the arguments, but he was unable to see anything due to his bedroom door being closed. A.W. stated there were cockroaches and approximately 20 dogs inside the home when asked about additional concerns.

In a separate interview, N.K. stated everything was going well at home. He denied ever going to bed without dinner or being prevented from eating after a certain time. The social worker asked about his relationship with stepfather, and he responded that stepfather gets angry a lot. Stepfather would become angry when the children did not listen to him. The children would have to write a few pages of standards for their punishment.

N.K. reported mother and stepfather would argue, but he denied witnessing any domestic violence in the home. He initially stated the home was clean, but he acknowledged there were cockroaches and several dogs in the home. It was the responsibility of everyone in the home to clean up after the dogs, but there were animal feces and urine in the home on occasion. N.K. denied being afraid of stepfather because he believed that stepfather could control his yelling and anger.

The social worker met with mother at the department's offices to discuss the referral. Mother explained that she lived in a five-bedroom home with stepfather and his mother, sister, sister's boyfriend, and sister's two children. Mother, stepfather, and the children lived in a mother-in-law suite that consisted of a converted living room and bedroom. Mother identified T.K. as the father of N.K., and A.K. was identified as A.W.'s father. A.W. maintained a relationship with his father and paternal grandparents.

Mother believed A.W.'s paternal grandparents made the referral after they brought up concerns to her about stepfather. A.W. had reportedly told his paternal grandparents that stepfather "smacked him." Mother stated it was impossible for father to have "smacked" A.W. because she was home the entire day. The social worker asked if there were any reasons that A.W. would lie, and mother responded that A.W. had been diagnosed with attention deficit disorder (ADD) and oppositional defiant disorder (ODD)

4.

approximately two years ago. Mother explained that the children were disciplined by writing standards such as, " 'I will not vandalize property.' " Both mother and stepfather were responsible for administering discipline of the children, but mother did not yell at the children like stepfather.

Mother acknowledged that stepfather raised his voice, but she described him as being "stern." She indicated the children loved stepfather, and she had no concerns about his interactions with the children. When asked about the children's fear of stepfather and his anger issues, mother claimed stepfather only came off as aggressive. The social worker explained that it was concerning that stepfather was allowed to discipline the children after the cause of B.S.'s injuries were still undetermined. Mother was unsure if she would make any plans to address the children's reported fear of stepfather.

In discussing the conditions of the home, mother claimed an exterminator had been treating the home for cockroaches in the kitchen, bathroom, and children's room for the past month. There were three dogs living in mother's living area of the home, and 12 dogs lived in the rest of the home. Mother denied there were animal feces inside her living area, but she could not speak to the rest of the home.

The social worker completed an interview of stepfather at the department's offices on the same date. Stepfather had been in a relationship with mother for almost three years. Stepfather denied all of the allegations of the referral. His discipline of the children consisted of having them write standards. Stepfather stated that he did not have any anger issues, and he did not believe the children were afraid of him. The social worker asked if father could benefit from an anger management class, and he responded in the negative. He claimed it was not often that he yelled, but he did raise his voice due to trauma from his childhood. Stepfather admitted there were cockroaches and several animals in the home.

The social worker called the children's maternal grandmother to discuss any concerns with mother or stepfather. The maternal grandmother did have concerns about

5.

stepfather's manner of speaking to and disciplining the children. She described a time where stepfather had a "full blow[n] meltdown" when she bought a present for one of the children. Stepfather was not allowed at the maternal grandmother's home because of the way he treated the children. She explained that stepfather became more aggressive after the birth of B.S. Stepfather would yell at the children to get away from B.S. The maternal grandmother described N.K. as more sensitive than A.W. N.K. told the maternal grandmother that he did not like being at the home with stepfather.

A visit was completed at the home of mother and stepfather on the afternoon of December 2, 2024, by department staff. There was a smell of urine leading up to the door of mother's area of the home. Random items and trash cluttered the area outside of mother's door. The social worker noted the smell of urine was overbearing inside of the home. Carpet cleaning shampoo masked the smell of urine in the children's bedroom, but the smell was "pungent" and "suffocating" as mother brought them into the main home.

Mother was surprised to learn that her home smelled like urine, but she explained stepfather's mother did not properly care for the animals that stayed in the main home. Mother confirmed that the only kitchen was located in the main home, and the family used the kitchen regularly. The social worker explained the urine in the carpets was a health and safety hazard for anyone living in the home. Mother and stepfather stated they were in the process of looking for another residence.

On December 3, 2024, the social worker spoke to the stepfather's sister, Miranda S., over the phone. Miranda was hesitant to speak with the social worker about her concerns regarding mother and stepfather because she did not want any problems in their home. She lived upstairs in the home, and she could often hear the children being yelled at by mother and stepfather through the walls. Miranda indicated the children were not allowed " 'to be kids.' " A.W. was reportedly forced to stay in his bed once he came home from school.

The stepfather's family members tried to speak to mother and stepfather about their concerns, but their efforts were not effective. Stepfather stopped speaking to the other family members in the home after the siblings were removed. The children were told not to speak to the stepfather's family members, and they would get in trouble if it was discovered that they spoke to his family. Miranda explained that A.W. would be punished by having to write "20 pages of standards" in his bed regularly. She also stated there were times that the children did not come out to eat dinner because they were already in bed for the night. Miranda overheard A.W. telling mother that he was afraid of being in the home with stepfather on the previous date.

On December 6, 2024, the department filed original petitions alleging the children were described by Welfare and Institutions Code section 300, subdivision (b)(1). The petitions alleged there was a substantial risk that the children would suffer serious physical harm or illness as a result of the failure or inability of mother to supervise or protect the children. The supporting facts contained in allegation "b-1" of the petition included: (1) A.W.'s statement that he was afraid of stepfather; (2) N.K.'s statement that stepfather could not control his anger; (3) mother and stepfather's frequent yelling at the children; (4) A.W.'s worrying about mother's safety as a result of stepfather's yelling and mother's crying; and 5) mother's awareness of father's aggressive behavior.

The petition further alleged the children were at substantial risk of suffering serious physical harm or illness by the willful or negligent failure of mother to provide adequate food and shelter. The supporting facts contained in allegation "b-2" of the petition included a description of the conditions of mother's home during the December 2, 2024 home visit. The children were allowed to remain in mother's home.

The department's report for the initial hearing detailed mother's child welfare history, which included three previous referrals for general neglect. In February 2021, law enforcement discovered N.K., at seven years of age, and A.W., at five years of age, at home by themselves while mother was at work. In December 2021, a referral alleged

N.K. had witnessed domestic violence between mother and his father, A.K. In September 2022, a referral alleged mother failed to feed the children before they returned to their father's custody. Each of the referrals were deemed inconclusive or evaluated out.

At the initial hearing held on December 19, 2024, mother was present and represented by counsel. Mother's counsel acknowledged receipt of the petition, and she expressed her intention to contest jurisdiction. The juvenile court granted a one-day continuance of the initial hearing. Mother's counsel entered denials and requested a contested jurisdictional hearing at the continued hearing. The court set a contested jurisdiction and disposition hearing for February 7, 2025, at mother's request. The contested hearing was continued due to the lack of a report from the department.

*Jurisdiction and Disposition*

The department's jurisdiction report, dated February 20, 2025, recommended that the allegations in the original petition be found true. On January 8, 2025, the assigned social worker made an unannounced visit to mother's home. The home appeared to be in better condition since the social worker's last visit, and the urine smell was present but no longer overbearing. Mother was shampooing the carpets every two days. Stepfather was starting to teach N.K. how to play golf, and N.K. was beginning to enjoy it. Mother reported N.K. had attention deficit hyperactivity disorder (ADHD), and he was having more behavioral problems at school. She was hoping N.K.'s regular physician would refer him for mental health services. A chore and consequence chart was put in place for discipline purposes.

The children attended supervised visits with mother and stepfather while the siblings were in out-of-home care. During a visit on January 25, 2025, stepfather attempted to help N.K. play his trumpet. N.K. became frustrated and wanted to cry. Stepfather continued to tell N.K. how to play the instrument, but mother eventually asked stepfather to stop because N.K. was becoming more upset. The social worker had to

intervene after stepfather made another attempt to help N.K. play the trumpet, and she explained that N.K. was unable to handle numerous intrusions. Mother agreed that it was best to let N.K. play the instrument, and stepfather remained quiet.

The department's disposition report, dated March 17, 2025, recommended the children remain placed with mother and family maintenance services be provided to mother. The department's assessment determined mother had a history of failing to protect her children from physical and mental abuse in the home. The children were not removed from the home due to the lack of risk of suffering injuries consistent with "shaken baby syndrome," but the department was concerned about mother's failure to recognize that stepfather did not have age-appropriate expectations for the children. The department hoped to monitor the family to ensure mother was making meaningful changes to protect the children.

On February 24, 2025, the contested hearing was trailed to allow the case to be heard by the regularly sitting judicial officer. The contested hearing was reset to March 18, 2025, and mother's counsel raised no objections to the sufficiency of the petition. The jurisdiction and disposition hearing for the siblings was also continued without a certain date for a contested hearing.

Mother was present and represented by counsel for the contested jurisdiction and disposition hearing on March 18, 2025. The juvenile court began the contested hearing by asking for the parties' positions as to jurisdiction. The department's counsel submitted on the petition and jurisdiction report. Mother's counsel made an oral motion to dismiss the petition under section 350, subdivision (c) without additional comment or argument. The children's counsel objected to the motion, and she argued there was sufficient evidence presented by the department. The department's counsel presented argument in opposition to the motion, and the juvenile court denied mother's motion to dismiss.

In denying the motion to dismiss, the juvenile court reasoned as follows:

9.

"A.W. has stated … that he's afraid of being home with [stepfather]. We have the statements of the children kind of documenting the emotional abuse that the children have experienced from [stepfather]. We have, also, the prior referrals, the long history of referrals documenting that.

"Initially, [mother] was in denial regarding this and didn't believe the feelings that [the children] had. Didn't understand the fear that they had of [stepfather].

It appears that [mother is] starting to gain some insight regarding the actions of [stepfather] and how it impacts them. And … she indicates she is learning that [A.W.] cannot be spoken to the way [N.K.] is. That [A.W.] is like a three year old and sometimes you have to treat him like a three year old.

I—it's unclear to me … whether [stepfather] has that same level of insight, and whether that's being put into practice. But I do have a child who has delays, and I have concerns whether [mother] will protect the children from [stepfather] and his verbal behavior towards the children and emotional behavior towards the children.

And so for those reasons, the Court does believe that the department has met their burden and will deny the request made by mother, through counsel, pursuant to [s]ection 350[, subdivision ](c)."

After the denial of the motion, mother's counsel presented an offer of proof for proposed testimony from mother. Her counsel indicated mother would testify the social worker found the family's home to be clean during a home visit on March 8, 2025. The juvenile court sustained the department's objection to the proposed testimony.

Mother's counsel proceeded to argument without presenting any evidence. Her counsel renewed the request for dismissal of the petition, and she argued the department failed to meet its burden regarding jurisdiction.

After hearing argument from counsel on jurisdiction, the juvenile court acknowledged N.K.'s statement that he was no longer fearful of stepfather. However, the court cited to the statements of stepfather's sister and the children's maternal grandmother regarding stepfather's treatment of the children. The court found the department met its burden to prove the section 300, subdivision (b)(1) allegation in the petition. Stepfather's statements in the department's report were found to be not credible

10.

by the court, and it noted the inconsistencies between stepfather's statements and the children's family members. The section 300, subdivision (b)(2) allegation pertaining to the condition of the home was found to be not true.

The juvenile court proceeded to order the children placed with mother, and family maintenance services were to be provided. Mother filed a timely notice of appeal on September 19, 2025.

**DISCUSSION**

Mother contends the juvenile court erred because the petitions were legally insufficient to state a cause of action under section 300, subdivision (b)(1). She also argues that there was no substantial evidence that the children were at substantial risk of serious physical harm.

### A. *Legal Principles*

Section 300, subdivision (b) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of … [¶] … [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).)

A finding under section 300, subdivision (b)(1) requires three elements: " (1) one or more of the statutorily specified omissions in providing care for the child …; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re R.T.* (2017) 3 Cal.5th 622, 626–628.) "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.) Thus, the juvenile court "may consider past events in deciding whether a child presently needs the court's protection." (*Id*. at p. 1216.)

11.

While "evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citations.] Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, italics omitted, abrogated on another ground in *In re R.T.*, *supra*, 3 Cal.5th at p. 628.)

## B.      *Standard of Review*

A juvenile court's jurisdictional findings are reviewed using the substantial evidence standard of review, where we determine whether evidence of reasonable, credible, and solid value supports the court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.) " '[W]e must uphold the [juvenile] court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

## C.      *Analysis*

### 1. Sufficiency of the Petition

As an initial matter, we note that mother failed to challenge the legal sufficiency of the allegations in the original petitions before the juvenile court. Mother did not file a demurrer to the petitions, or otherwise move to dismiss them as legally insufficient. Mother relies on *In re Alysha S.* (1996) 51 Cal.App.4th 393 and argues she may raise this issue for the first time on appeal. In the alternative, she asserts her attorney preserved the issue in her argument at the jurisdictional hearing. Respondent argues that mother's counsel did not preserve this issue, and her failure to file a demurrer to the sufficiency of

the pleadings waived her right to claim error for the first time on appeal.  We agree with respondent.

In the case of *In re Alysha S.*, the Third District Court of Appeal held that a challenge to the sufficiency of the dependency pleadings was " 'akin' " to a demurrer in a civil case.  (*In re Alysha S.*, *supra*, 51 Cal.App.4th at p. 397.)  Analogously, the court reasoned that failure to object to the sufficiency of a dependency pleading does not waive the issue because failure to object that a civil pleading does not state facts sufficient to constitute a cause of action does not waive the issue on appeal pursuant to Code of Civil Procedure section 430.80, subdivision (a).  (*Alysha S.*, at p. 397.)

The Sixth District Court of Appeal reached a different conclusion in *In re Shelley J.* (1998) 68 Cal.App.4th 322, finding that Code of Civil Procedure section 430.80, subdivision (a) does not apply to dependency actions.  (*Shelly J.*, at p. 328.)  Instead, the court in *Shelley J.* concluded that *Alysha S.* was wrongly decided because it failed to "acknowledge that rules applicable to civil cases are not applicable to dependency actions unless expressly made so.  'Dependency proceedings in the juvenile court are special proceedings governed by their own rules and statutes.  [Citations.]  Unless otherwise specified, the requirements of the Civil Code and the Code of Civil Procedure do not apply.' "

While we have found no statute specifically authorizing a demurrer in the context of a dependency proceeding, we note that the courts have recognized the demurrer or a motion to dismiss as an appropriate device to challenge the sufficiency of the pleadings in dependency cases.  (*In re Troy D.* (1989) 215 Cal.App.3d 889, 896; *In re Barbara P.* (1994) 30 Cal.App.4th 926, 930.)  We agree with the result in *Shelley J.* that a challenge to the sufficiency of the dependency pleadings must be preserved by an objection in the original proceedings.

Prompt resolution of a child's custody status and a stable environment in which to develop are the two most important legislative goals underlying dependency proceedings.

(*In re Erika W.* (1994) 28 Cal.App.4th 470, 476.) To allow a parent to challenge the sufficiency of the pleadings for the first time months or years after the court's exercise of jurisdiction would undermine the Legislature's intent. Here, mother failed to object to the sufficiency of the pleadings. She has, therefore, waived that issue for appellate review.

Mother nonetheless asserts that her counsel's motion to dismiss pursuant to section 350, subdivision (c) preserved her challenge to the petition's failure to state a cause of action. Contrary to mother's contentions, the motion to dismiss, taken in context, was directed at the sufficiency of the evidence to support the juvenile court's jurisdictional findings under section 300, subdivision (b). Counsel's motion and argument did not challenge the sufficiency of the department's allegations and mother failed to preserve this issue for review.

We note that other reviewing courts have observed that, so long as the juvenile court's jurisdictional findings are supported by substantial evidence and the parent received adequate notice of the factual allegations against him or her, the adequacy of the petition is irrelevant. (*In re Athena P.* (2002) 103 Cal.App.4th 617, 628; *In re Javier G.* (2006) 137 Cal.App.4th 453, 458–459.) Those courts have reasoned that, under the California Constitution, in all legal proceedings including dependency proceedings, "[n]o judgment shall be set aside … for any error as to any matter of pleading … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

Accordingly, "[i]f the evidence at the jurisdictional hearing was insufficient, [the parent] can seek reversal on that ground. But if the evidence was sufficient to support the juvenile court's findings, any failure of the petition to state a cause of action became harmless error. Either way, the only issue before us is the sufficiency of the evidence at the jurisdictional hearing." (*In re Athena P.*, *supra*, 103 Cal.App.4th at p. 628.)

*2. Sufficiency of the Evidence*

Mother argues sufficient evidence does not exist to support the juvenile court's finding of jurisdiction under section 300, subdivision (b). She asserts there was no evidence her children were suffering, or were at risk of suffering, serious physical harm and that her failure to protect or provide adequate supervision caused any serious physical harm or risk of such harm. We disagree.

In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is "substantial" if it is reasonable, credible and of solid value. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194–196.) The focus of section 300 is on averting harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

"The [juvenile] court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)" (*In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1215–1216.) "Facts supporting allegations that a child is one described by section 300 are cumulative." (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1050.) Thus, the court "must consider all the circumstances affecting the child, wherever they occur." (*Id*. at pp. 1048–1049.)

In the present case, the department had already been involved with mother and stepfather due to the severe injuries inflicted on the children's younger sibling, B.S. The injuries occurred while the sibling was in the custody of mother and stepfather, and there were no reasonable explanations provided for the injuries, which were consistent with "shaken baby syndrome." The maternal grandmother described stepfather as becoming more aggressive after the birth of B.S. Mother continued to allow stepfather to discipline the children while the cause of B.S.'s injuries were undetermined.

At the time of the petition's filing, A.W. had been exposed to regular yelling between mother and stepfather, and he believed mother was being hurt during these instances. Both the children and mother reported stepfather often yelled at the children. Stepfather's sister heard A.W. inform mother of his fear of living with stepfather, and A.W. was worried that stepfather would be angry with him for speaking to the social worker about his concerns. Mother was also aware that A.W. reported being "smacked" by stepfather to his paternal grandparents. However, mother failed to intervene and protect the children from stepfather's unresolved anger issues and excessive discipline.

The juvenile court properly cited and relied upon the consistent statements of the children, mother, maternal grandmother, and stepfather's sister regarding stepfather's aggressive and volatile demeanor. Stepfather's own statements denying that he had an anger problem or yelled at the children were reasonably discredited by the court. Although mother had shown an ability to gain some insight into the risk posed by stepfather's anger management problem, the court was not required to ignore mother's history of allowing stepfather to regularly yell at the children as a form of discipline and engaging in verbal arguments in the children's presence. There was a real and substantial risk that stepfather's anger would continue to escalate such that the children would be physically harmed as B.S. had already been.

Mother's contention that there was no evidence that she had physically harmed the children overlooks the limited role of a reviewing court. Contrary to mother's assertions,

when reviewing a record for substantial evidence, as we are required to do here, we do not reweigh evidence or substitute our judgment for that of the finder of fact. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.) In reviewing the sufficiency of the evidence, we uphold a finding even if there was evidence to support a contrary conclusion if the "substantial evidence" standard is satisfied. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) Based upon the present record, stepfather's volatile temperament could certainly present a substantial risk of harm to the children. Accordingly, the juvenile court could reasonably conclude on these facts that court supervision was required to ensure that the children did not suffer serious physical harm in the near future.

Finally, we reject mother's contention that the juvenile court only believed the children suffered from emotional harm. Taken in its proper context, the court merely acknowledged the children's suffering of emotional harm when it denied mother's motion to dismiss. The court's actual findings did not rely upon emotional harm as a basis for exercising jurisdiction pursuant to section 300, subdivision (b)(1). Furthermore, the absence of any actual physical harm being inflicted on the children is irrelevant, as subdivision (b)(1) only requires a "substantial risk" that the child will be harmed. "[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

In sum, mother's failure to appreciate the extent of stepfather's anger issues and unexplained, severe injuries to a sibling were relevant to the juvenile court's determination of whether the children presently needed the court's protection. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) " '[A] measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) Drawing all reasonable inferences from the record, we

conclude substantial evidence supports the court's finding that mother's conduct placed the children at a substantial risk of suffering serious physical harm or illness, warranting dependency jurisdiction.

## DISPOSITION

The juvenile court's orders are affirmed.